FILED

2012 SEP 18  AM 11: 37

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

P. Stephen Lamont, Pro Se
Email: psl.iviewit@gmail.com
926 Boston Post Road
Rye, New York, 10580
Tel.: (914)-217-0038

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

P. STEPHEN LAMONT, individually, AND
AS NOMINEE FOR 100% OF THE
CAPITAL SHARES OF IVIEWIT
HOLDINGS, INC.,

     Plaintiff,

v.

TIME WARNER INC., and
WARNER BROS. ENTERTAINMENT
GROUP

     Defendants.

CV12   08030 CAS   VBKx

Case No.:

Complaint

## BREACH OF CONTRACT

## NATURE OF THE ACTION

1.    This is an action for compensatory and punitive damages, proximately the result of conduct engaged in by Defendants while jointly and severally acting and

RECEIVED
CLERK, U.S. DISTRICT COURT

SEP - 5 2012

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

-1-



PAID

SEP 1 8 2012

Clerk, US District Court
COURT 312

having devised schemes and artifices to obtain money or property by means of false or fraudulent pretenses, representations, or promises, in violations of Plaintiff's contractual rights; and, the result of further conduct engaged in by Defendants for violations of confidentiality agreements pertaining to disclosures of certain technologies invented by and the rights held by Plaintiff, and for their continued unauthorized uses notwithstanding demands made to halt such uses.

## JURISDICTION AND VENUE

2.     This Court has original jurisdiction over this civil action as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States under 28 U.S.C. §1332.

3.     By 28 U.S.C. §1332, Plaintiff proceeds in this Court under diversity of citizenship as Plaintiff is a resident of the State of New York, Defendants Time Warner Inc. and Warner Bros. Entertainment Group are Delaware corporations, and Warner Bros. Entertainment Group is based in Burbank, Cal.

4.     Venue is proper in this district pursuant to 28 U.S.C. §1391 because a significant portion of the Defendants' business is transacted in the Central District of California, and for those Defendants that do not, and for the sake of judicial expediency, this Court has supplemental jurisdiction over all other Defendants that are so related to claims in the actions of the parties within such original jurisdiction that they form the Court's jurisdiction.

## THE PARTIES

5.     Plaintiff, P. Stephen Lamont, is the Chief Executive Officer of Iviewit Holdings, Inc. ("Iviewit") and a significant shareholder of Iviewit, a multimedia technology company that holds the patent pending rights to: backbone, enabling technology for the encoding and transmission of digital video across all transmission networks and viewable on all display devices; image overlay systems that stake the claim as the inventors of digital zoom on all video capture devices; and a technology pertaining to the remote control of video devices ("Technologies").

6.     Defendant Time Warner Inc. (hereinafter "TW"), sued in its capacity as a Delaware corporation, at all times relevant to this complaint is the parent company of Warner Bros. Entertainment Group ("WB"), who failed to supervise its wholly owned subsidiary, WB among others, in its unlawful activities of violating executed non-disclosure agreements and contracts containing confidentiality clauses and warranties to not use Plaintiff's Technologies without authorization; TW has not supervised WB and others to abide by those agreements and contracts and continues to allow the use of Plaintiff's Technologies without authorization.

7.     Defendant WB, sued in its capacity as a Delaware corporation, at all times relevant to this complaint is a fully integrated, broad-based entertainment company and a global leader in the creation, production, distribution, licensing and marketing of all forms of entertainment, and their related businesses.  Additionally, WB was

one of the first strategic alliance partners of Plaintiff who executed non-disclosure agreements and contracts containing confidentiality clauses and warranties not to use Plaintiff's Technologies without authorization; WB has not abided by those agreements and contracts and conducts and has conducted the continuous use of Plaintiff's Technologies without authorization.

8.     John Doe Companies, it is anticipated, but not now claimed, that the same knowledge transfers and technology disclosures that flowed from Plaintiff to WB (not supervised by TW) had found their way into the content encoding of Turner Broadcasting, Inc. and Home Box Office, Inc., sister companies of WB and wholly owned subsidiaries of TW, without Plaintiff's authorization.

## STATEMENT OF FACTS

9.     In or about the fall of 1998, in Boca Raton, Fla., and at all times relevant to this Complaint, inventors of a soon to be formed corporation, Zakirul A. Schirajee, Jude R. Rosario, and Eliot I. Bernstein (collectively "Inventors") designed and developed inventions pertaining to what industry experts have heretofore described as profound shifts from traditional techniques in video and imaging then overlooked in the annals of digital video and imaging technologies.

10.     On August 14, 2000 Iviewit and Defendant WB, a unit of Defendant TW, entered into a Confidentiality Agreement ("Colter NDA") under the signature of

-4-

David Colter, Vice President, Technology and Standards (hereinafter, "Colter") of WB, attached herein as Exhibit "A". Such NDA provides that:

a. "'Proprietary Information' means all confidential materials and information…(vi) any…trade secrets, patent designs, patents, patent applications…" and

b. "'…The undersigned [TW] acknowledges…(b) not to use any of the Proprietary Information without the prior written consent of…the Company [Plaintiff]" and

c. "'…the undersigned [TW] understands that …all Proprietary Information is and shall remain the exclusive property of the Company [Plaintiff], and no license or other rights are being granted to the undersigned [TW] by the Company [Plaintiff]."

11.    Formally, beginning on December 21, 2000, Plaintiff introduces the Technologies to TW's now wholly owned subsidiary WB through Colter (Colter and a one Gregory B. Thagard had been in contact with Plaintiff as early as August 2000); subsequently, WB validates the Technologies in its multimedia lab in Glendale, Cal., and begins to utilize the Technologies according to strategic alliance contracts and non-disclosure agreements ("NDAs").

12.    Where the discussions among Plaintiff, WB, and TW addressed the fundamentality of Plaintiff's Technologies and their critical importance across a

broad spectrum of WB and TW's applications including, but not limited to, encoding of feature films of WB, encoding of television shows of WB and TW, replication of Blu-ray and DVD discs according to Plaintiff's techniques, transmittal of Plaintiff's encoded video across the head ends of Time Warner Cable (hereinafter "TWC") at all times relevant to this complaint up to and until TW's spin-off of TWC in 2008, and storage and decoding of Iviewit encoded video on set top boxes provided by TWC to its end users at all times relevant to this complaint up to and until TW's spin-off of TWC in 2008.

13.   What the NDAs referred to and the business discussions pertained to are Plaintiff's profound shifts from traditional techniques in video and imaging then overlooked in the annals of digital video and imaging technologies, that generally consist of:

    a.  Video Scaling.

        i.  Recording new original video by any generalized video capture device whether by a digital video capture device or 35 millimeter film or other video capture device that proceeds to:

        ii.  Transforming to digital ("encoding") those non-digital frames at a 320x240 frame size ("pixel capture") that proceeds to;

        iii.  Editing the now digital video frames at a 320x240 pixel capture that proceeds to;

      iv. A final capture of the now digital video frames at a 320x240 pixel capture that is then marked up, uploaded, and executes a list of commands ("script") on the Internet; or uploaded to any multimedia server for transmission over any generalized terrestrial network; or uploaded to any multimedia server for transmission over any generalized cable network; or uploaded to any multimedia server for transmission over any generalized satellite network; or uploaded to any multimedia server for transmission over any generalized Telco network.

  b. Image Overlay Systems.

      i. photographing images at high resolutions that proceeds to;

      ii. developing images that proceeds to;

      iii. stitching images together that proceeds to;

      iv. scanning an image that proceeds to enlarging, touching up, and converting images from Bitmap to JPEG;

      v. manipulating the processes of photographing images by 1 to 3 above for purposes of "zoom out," whereby when an image is "zoomed back in" it suffers no distortion ("pixelation").

14. With that said the claims of the knowledge transfers and technology disclosures (including the pricings for the benefit of this Court) made to Defendants

TW and WB pertaining to U.S Patent No.s:  09/630,939, 09/522,721, 09/587,734, 09/587,026, 09/587,730, among others require, once authorization is granted, the following:

    a. For those products encoded according to the Technologies, payment of royalties of $1.80 per unit (exclusive of volume discounts);

    b. For those systems that transmit products encoded according to the Technologies, payment of royalties of $1.80 per stream (exclusive of volume discounts);

    c. For those devices that store and/or render and decode products encoded and transmitted according to the Technologies, payment of royalties of $1.80 per unit (exclusive of volume discounts);

    d. For those products that zoom and pan without pixelation according to the Technologies, payment of royalties of $1.00 per device (exclusive of volume discounts); and

    e. For those products that inclusive of a, b, or c above when combined with d above according to the Technologies, payment of royalties of $2.50 per unit/stream/device (exclusive of volume discounts).

15.   Defendants TW and WB have neither obtained authorization nor made payment of royalties according to the pricing above[1], but continuously apply the Technologies in material breach of NDA.

16.   Where, when utilizing Plaintiff's Technologies, WB and TW experienced a seventy five percent (75%) savings in bandwidth, storage requirements, and lower processing power that resulted in the ability to deliver full screen, full frame rate[2] video previously unachievable by WB and TW.

17.   Similarly, on February 27, 2001, Plaintiff, again, enters into a Confidentiality Agreement (Mutual) this time with Warner Bros. Online ("WBOL I NDA"), a unit of Defendant TW, under the signature of Ray Caldito, Director, attached herein as Exhibit "B" that states:

     a.   "3. Miscellaneous. All Confidential Information remains the property of the disclosing party and no license or other rights is granted or implied hereby…"

18.   Still further, on August 14, 2001 Plaintiff and WB, a unit of Defendant TW, entered into a Confidentiality Agreement under the signature of Jim Noonan, General Manager/SVP (hereinafter, "WBOL II NDA") of WB, attached herein as Exhibit "C". Such NDA provides that:

---

[1] Plaintiff states that such pricing was formulated in conjunction with Gregory B. Thagard, the holder of six issued patents in the DVD6C licensing pool, and the "father" of DVD as we know it today.
[2] The desired characteristics of digital video are to achieve full screen, full frame rate (generally 24-30 frames per second to those skilled in the art), where below full frame rate, as TW was only able to achieve, would have been jerky motion, audio and video out of sync video circa 1998 prior to Iviewit techniques.

d. "'Proprietary Information' means all confidential materials and information...(vi) any...trade secrets, patent designs, patents, patent applications...;" and

e. "'...The undersigned [TW] acknowledges...(b) not to use any of the Proprietary Information without the prior written consent of...the Company [Plaintiff];" and

f. "'...the undersigned [TW] understands that ...all Proprietary Information is and shall remain the exclusive property of the Company [Plaintiff], and no license or other rights are being granted to the undersigned [TW] by the Company [Plaintiff]."

19.    Where both the Colter NDA and the WBOL II NDA contain a paragraph 3 ("No Opposition Paragraph") which states:

a. "The undersigned (TW) further agrees that the Company [Plaintiff] shall be entitled to equitable relief, including injunction, in the event of any breach of this Confidentiality Agreement, that the granting of such relief will not be opposed..."

20.    Beginning in the summer of 2001, and at all times relevant to this complaint, WB and TW, after validating the Technologies in its multimedia lab in Glendale, Cal., and after the expiration of strategic alliance contracts, begins to conduct the

unauthorized use of Technologies in direct violation of strategic alliance contracts and NDAs.

21.    On January 14, 2002, in an electronic mail message, Colter transmits a message to his direct reports, a one Chuck Dages, Senior Vice President of Advanced Technology and a one Alan Bell, Executive Vice President of Advanced Technology, attached herein as Exhibit "D" and states:

    a.  "Prior to Iviewit...the video we delivered on the web was...smaller and below full frame rate.    At the time of our first meeting, we...identified...Iviewit...who could deliver full frame rate web video [on a 56kps dial up connection]," and Colter further states,

    b.  "In the fall of 2000, Iviewit also met with a number of folks at WB Online [the Internet video unit of Warner Bros., a wholly owned subsidiary of Defendant TW] and demonstrated their processes and techniques to Sam Smith, Houston, and Joe Annino and others.  Sam contacted Iviewit a number of times and requested the patents along with the specifics of the Iviewit process to evaluate what they were doing. When I sat down with Morgan and Houston in March 2001 to see what they were using to encode video, it was clear that they were using...the techniques that would overlap with Iviewit's filed process patents," where Colter closes and states,

c. "We signed the confidentiality agreement, Iviewit revealed their processes and techniques, and <u>we now use those techniques in encoding</u>" (emphasis supplied).

22.   At all times relevant to this complaint, WB and TW, after validating the Technologies in its multimedia lab in Glendale, Cal., continuously conducts the unauthorized use of Technologies in direct violation of strategic alliance contracts and NDA; in the fall 2010, Plaintiff demanded that WB and TW Cease and Desist their unauthorized use of the Technologies where, as of even date below, WB and TW have not complied with this demand.

23.   In a Corporate Resolution dated April 1, 2011 Plaintiff and the Nominors in this instant action RESOLVED that on April 21, 2011 all Confidentiality Agreements, retainer agreements, and contracts of any shape or form from any Iviewit entity were assigned to holders of the capital shares of Iviewit Holdings, Inc., giving Plaintiff, individually, and as Nominee a <u>direct, personal interest</u> in the claims of the instant action.

24.   On April 29, 2011, an Assignment and Assumption Agreement was executed assigning more than 150 NDA's and other contracts from various Iviewit entities to the shareholders of Iviewit Holdings, Inc.; several more NDA's had non-assignment clauses within them.  The Colter NDA, WBOL I, and WBOL II NDAs DID NOT HAVE non-assignment clauses.

25.    On August 10, 2012, Plaintiff and the Nominors re-affirmed their assignment of all Confidentiality Agreements, retainer agreements, and contracts of any shape or form from any Iviewit entity to holders of the capital shares of Iviewit Holdings, Inc., giving Plaintiff, individually, and as Nominee a direct, personal interest in the claims of the instant action.

26.    According to § 241 of the Restatement (Second) of Contracts, WB and TW continuously conduct and have conducted the material breach of the Colter NDA of August 14, 2000, the WBOL I NDA of February 27, 2001, and the WBOL NDA II of August 14, 2001 where the following circumstances are significant:

    a.  "...the extent to which the injured party will be deprived of the benefit which he reasonably expected;

    b.  the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

    c.  the extent to which the party failing to perform...will suffer forfeiture;

    d.  the likelihood that the party failing to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

    e.  the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing."

27.   In the case of the instant action comporting the material breach of § 241:

    a.  Plaintiff bargained for WB and TW's use of the Technologies only with written authorization and payment of royalties;

    b.  Part of that benefit of which Plaintiff will be deprived: royalties for authorized use and the damages Plaintiff prays for in this instant action;

    c.  TW and WB will suffer forfeiture: the damages Plaintiff prays for in this instant action and the removal of Plaintiff's Technologies from the process of transforming to digital filmed entertainment, television programming, the transmission of such bandwidth, storage, and less processing power intensive video, and replication of discs absent a royalty agreement for such continued use;

    d.  TW and WB have not abided by the fall 2010 Cease and Desist demand issued nearly 24 months ago, the August 13, 2012 Cease and Desist demand, and has not responded to overtures to settle Plaintiff's claims and the offer of a royalty agreement for continued use;

    e.  By WB and TW's continuous use, from the spring of 2001 to even date below, of the Technologies without written authorization and payment of royalties, notwithstanding three executed NDAs designed to prevent such, WB and TW's material breach violates the standards of good faith and fair dealing of § 241.

28.     On August 8, 2012, in *Lamont, et. al. v. Proskauer Rose, LLP* (U.S.D.C., D.C. 11:949, filed May 19, 2011) ("*Lamont*"), the District Court dismissed plaintiff's sole Federal claim and declined to invoke its supplemental jurisdiction over the contract claims against TW.

29.     Where, as in the words of the court, "the court has declined to exercise supplemental jurisdiction as to those [contract] claims [of TW]," Defendants may lay no claim to collateral estoppel or *res judicata*.

30.     Where Plaintiff pleads, in part, under the continuing violations doctrine (see ¶¶ 7, 15, 22, 26, 27), Defendants may not move for a dismissal under any statute of limitations as the limitations period begins to run only when the Defendants cease their unlawful conduct; there has been no cessation in the use of the Technologies since the knowledge transfers and technology disclosures under NDA.

31.     Where by paragraph 3 of the Colter NDA and the WBOL II NDA, No Opposition Paragraph, Defendants cannot oppose Plaintiff's motion for injunctive relief filed simultaneously with this Complaint.

32.     Where the Defendants in the instant action cannot claim undue delay where from 2002 to 2010, Plaintiff appealed to the Iviewit Founder to bring such claims to court, as evidenced by Plaintiff's electronic mail message to John Calkins of Defendant WB on February 27, 2002, attached herein as Exhibit "E," only to be blocked.

33.   From 2005 to 2010, a power struggle ensued wherein the Founder was terminated for cause in September 2010; Plaintiff filed suit in *Lamont* several months later, which Plaintiff continues in this instant action.

34.   On August 10, 2012, Plaintiff sent an electronic mail message to Paul T. Cappuccio, Executive Vice President and General Counsel of TW ("Cappuccio"), advising him of the violations of the NDAs in Exhibits A, B, and C, with a view towards settling the claims; similarly, on this date, Plaintiff also attached an Advanced Royalty Agreement to such electronic mail message to Cappuccio authorizing the use of Plaintiff's knowledge transfers and technology disclosures going forward.

35.   On August 13, 2012, Plaintiff reaffirmed the Cease and Desist demand by sending an electronic mail message to Cappuccio requesting the discontinuance of the Defendants use of video and imaging techniques learned under NDAs pertaining to United States Patent No's: 09/630,939, 09/522,721, 09/587,734, 09/587,026, 09/587,730, among others, without authorization, attached herein as Exhibit "F."

36.   By: the ignorance of the fall 2010 Cease and Desist demand; the lack of a response by Cappuccio in the requested twenty one (21) day period to settle the claims of unauthorized uses of the Technologies and an agreement to continue such uses of the Technologies; and, the ignorance of the re-affirmed Cease and Desist demand of August 13, 2012 led to the instant action herein.

## CONCLUSION

37.    Under the premises Plaintiff has been caused to suffer more than eleven (11) years of unpaid royalties on the Technologies by: WB, TW, and John Doe Companies as encoders of digital video according to the Plaintiff's Technologies; TW and TWC as transmitters of video derived by Plaintiff's Technologies; TW and WB as replicators of video derived from Plaintiff's Technologies on Blu-ray and DVD discs; and, TW and TWC's devices where video derived from Plaintiff's Technologies are rendered or decoded and stored.

38.    Further to these premises, as a result of the unpaid royalties, Plaintiff has been caused to suffer further loss of value in the capital shares held by Plaintiff.

## COUNT ONE
### Breach of Contract
### (All Defendants)

39.    Plaintiff repeats and realleges each and every allegation contained in paragraph "8" through "38" as though fully set forth herein.

40.    As a result of the Defendants' acts, Plaintiff now suffers and will continue to suffer irreparable injury and monetary damages, and that Plaintiff is entitled to damages sustained to date and continuing in excess of the amount of Two Hundred and Fifty Million Dollars ($250,000,000) as well as punitive damages, costs, and attorney's fees.

**WHEREFORE,** a judgment is respectfully demanded:

a.      Awarding against each of the individually named Defendants such punitive damages as the jury may impose, but not less than Two Hundred and Fifty Million Dollars ($250,000,000);

b.      Awarding against all Defendants such compensatory damages as the jury may determine, but not less than Two Hundred and Fifty Million Dollars ($250,000,000);

c.      Permanently enjoining Defendants' from further conducting the unauthorized use of Plaintiff's Technologies;

d.      Awarding reasonable attorney's fees and costs; and,

e.      Granting such other and further relief as this Court deems just and proper.

**JURY TRIAL IS DEMANDED**

Plaintiff demands a trial by jury on all claims so triable.

Dated:          August 31, 2012

For Plaintiff:

# P. Stephen Lamont

Digitally signed by P. Stephen Lamont
DN: cn=P. Stephen Lamont, o=Iviewit
Technologies, Inc., ou,
email=psl.iviewit@gmail.com, c=US
Date: 2012.09.07 14:52:14 -04'00'

By:

P. Stephen Lamont, Pro Se
**926 Boston Post Road**
**Rye, New York, 10580**
**Email: psl.iviewit@gmail.com**
**Tel.: (914)-217-0038**

-18-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit "A"

## CONFIDENTIALITY AGREEMENT

To:    **iviewit, Inc.**
Attention:  Brian G. Utley
2255 Glades Road, Suite 337-W
Boca Raton, Florida 33431-7360

The undersigned acknowledges and agrees that any and all "Proprietary Information" provided by or on behalf of **iviewit, Inc.**, a Delaware corporation, and its affiliates collectively the "Company", Simon L. Bernstein, Eliot I. Bernstein., or any officer, director, employee, agent or representative of the Company to the undersigned, or to which the undersigned otherwise gains access to, shall be subject to the terms and conditions of this Agreement. "Proprietary Information" means all confidential materials and information (regardless of the form of such information, including without limitation, in writing, electronic, computerized or other recorded form, oral or visual) marked as "Confidential" or, if disclosed orally, confirmed in writing as "Confidential" within thirty (30) days that the undersigned may receive or learn of now or in the future concerning, or related in any way to, the Company, its technology, or its business, including without limitation: (i) the contents of any Business Plan, projections or financial or credit information or data relating to the Company; (ii) the contents of any manuals or written materials of the Company; (iii) the names and records of actual or prospective clients, customers, suppliers, lenders, financing sources, or related persons; (iv) the terms of various agreements between the Company and third parties; (v) any data or database, or other information compiled or developed by the Company; (vi) any computer programs and listings, source codes and/or object codes, file structures, trademarks, trade secrets, patents, patent designs, patent applications, copyrights, forms, procedures, processes, training methods, developments, technical information, marketing activities and procedures and methods of operation, methodologies and processes for the display of video on the World Wide Web, together with any other information, data, know-how or knowledge of a confidential or proprietary nature; and (vii) any information of a type described above derived or obtained from the internet or any website of the Company, including without limitation, the file structure relating to such website or the content of such website. Notwithstanding the foregoing, the term "Proprietary Information" does not include information which (i) is already known to the undersigned or in the undersigned's possession, (ii) is or becomes generally available to the public other than as a result of a disclosure by the undersigned, or (iii) becomes available to the undersigned on a non-confidential basis from a source other than the Company or its representatives, provided that such source is not known, to be bound by a confidentiality agreement with, or other obligation of secrecy to, the Company, or, (iv) is independently developed by the undersigned without violating this Agreement. The undersigned shall bear the burden of demonstrating the availability of any of the exceptions set forth in the preceding sentence.

The undersigned acknowledges that the Proprietary Information constitutes valuable, special and unique assets of the Company. The undersigned agrees (a) to receive in trust, and treat as confidential, the Proprietary Information; (b) not to use any of the Proprietary Information for any purpose without the prior written consent of Brian Utley, Simon L. Bernstein or Eliot Bernstein on behalf of the Company; (c) not to disclose any of the Proprietary Information to anyone (other than to such of the undersigned's employees or advisors who have a need to know such Information for the sole purpose of assisting the undersigned in evaluating such Information; provided that the undersigned shall be liable for any breach of confidentiality or use by such employees or advisors) without the prior written consent of Brian Utley, Simon L. Bernstein or Eliot Bernstein on behalf of the Company; (d) not to reproduce, store or copy any Proprietary Information in any form (other than as necessary to evaluate such Proprietary Information) without the prior written consent of Brian Utley, Simon L. Bernstein or Eliot Bernstein on behalf of the Company; in the event that the parties do not proceed to an agreement, all items including all duplicates and copies will be returned to the company or proof of their destruction will be provided, and (e) not to fax, distribute or reverse engineer any Proprietary Information. The

undersigned understands that all Proprietary Information is confidential and that all rights, title and interest in the Proprietary Information is and shall remain the exclusive property of the Company, and no license or other rights are being granted to the undersigned by the Company.

The undersigned further agrees that the Company shall be entitled to equitable relief, including injunction, in the event of any breach of this Confidentiality Agreement, that the granting of such relief will not be opposed and that such relief shall not be the exclusive remedy for such breach. Furthermore, the undersigned agrees to defend and hold harmless the Company from any loss, cost, expense (including attorney's fees and litigation expenses), claim, liability, or damage arising from or related to a breach of this Confidentiality Agreement.

This Agreement shall expire three (3) years from the date of execution.

This Confidentiality Agreement shall be governed by California law.

The undersigned has executed this Confidentiality Agreement as of the date set forth below.


By: _____

Print Name:     David Colter
                VP Technology and Standards

Company:        Warner Bros


Date: _Aug 14/00_

4708/40017-001  BRLIB1/251214 v1 12/27/99  03:00 PM  (2761)

1
2
3
4
5
6
7
8
9
10
11
12
13
14

Exhibit "B"

15
16
17
18
19
20
21
22
23
24
25
26
27
28

FEB. 28. 2001  3:10PM PM

NO. 46660  P. 22

## WARNER BROS. ONLINE
### Confidentiality Agreement (Mutual)

This "**Agreement**" is entered into and is effective as of February 27, 2001 by and between Warner Bros. Online, a division of Time Warner Entertainment Company, L.P., ("**WB Online**") and the entity named below and which is referred to herein as "**Recipient**".

1. **Definition of Confidential Information**: Each party agrees that all information and materials disclosed by WB Online and Recipient regarding a proposed business deal between the parties, including the terms and conditions of this Agreement and the existence of the discussion between the parties, will be considered and referred to collectively in this Agreement as "**Confidential Information.**" Confidential Information, however, does not include information that: is now or subsequently becomes generally available to the public through no fault or breach on the part of either party; either party can demonstrate to have had rightfully in its possession prior to disclosure to the receiving party; is independently developed by either party without the use of any Confidential Information; or either party rightfully obtains from a third party who has the right to transfer or disclose it.

2. **Nondisclosure and Nonuse of Confidential Information**: The parties shall not disclose, publish, or otherwise disseminate Confidential Information to anyone other than those of its employees with a need to know, and each party shall take reasonable precautions to prevent any unauthorized use, disclosure, publication, or dissemination of Confidential Information. The parties accept the Confidential Information for the sole purpose of evaluation in connection with either parties' business discussions with each other. Each party shall not use Confidential Information otherwise for its own or any third party's benefit without the prior written approval of an authorized representative of the disclosing party in each instance. The foregoing restrictions on Confidential Information shall not apply to Confidential Information that is required to be disclosed in connection with any suit, action or other dispute related to the Confidential Information, or otherwise required to be disclosed as a matter of law.

3. **Miscellaneous**: All Confidential Information remains the property of the disclosing party and no license or other rights to Confidential Information is granted or implied hereby. All Confidential Information is provided "AS IS," and without any warranty, whether express or implied, as to its accuracy or completeness. Each party hereby acknowledges that unauthorized disclosure or use of Confidential Information could cause irreparable harm and significant injury to the disclosing party that may be difficult to ascertain. Accordingly, each party agrees that the disclosing party will have the right to seek and obtain immediate injunctive relief to enforce obligations under this Agreement, in addition to any other rights and remedies each party may have.

4. **Entire Agreement and Governing Law**: This Agreement constitutes the entire agreement with respect to the Confidential Information disclosed herein and supersedes all prior or contemporaneous oral or written agreements concerning such Confidential Information. This Agreement may not be amended except by the written agreement signed by authorized representatives of both parties. This agreement will be governed by and construed in accordance with the laws of the State of California, excluding that body of California law concerning conflicts of law. This Agreement may be executed by facsimile signature and in counterparts, which taken together shall constitute one and the same instrument.

Understood and Agreed to by the duly authorized representative of the parties:

| WARNER BROS. ONLINE | Name of Company/ Recipient: | jviewit Technologies, Inc. |
|---|---|---|
| By: _Ray Calcito_ | Signature: | |
| Title: _Director_ | Title: | President and COO |
| | Print Name: | Brian G. Utley |

NDA mutual- WBOL.doc

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit "C"

## CONFIDENTIALITY AGREEMENT

To:   **Iviewit, Inc.**
Attention:  Elliot Bernstein
     2255 Glades Road, Suite 337-W
     Boca Raton, Florida 33431-7360

  The undersigned acknowledges and agrees that any and all Proprietary Information"
provided by or on behalf of iviewit, Inc., a Delaware corporation, and its affiliates
collectively the "Company", Simon L. Bernstein, Eliot I. Bernstein, or any officer, director,
employee, agent or representative of the Company to the undersigned, or to which the
undersigned otherwise gains access to, shall be subject to the terms and conditions of this
Agreement. "Proprietary Information" means all confidential materials and information
(regardless of the form of such information, including without limitation, in writing,
electronic, computerized or other recorded form, oral or visual) marked as "Confidential" or
with other similar types of markings or, if disclosed orally, confirmed in writing as
"Confidential" within thirty (30) days that the undersigned may receive or learn of now or in
the future concerning, or related in any way to, the Company, its technology, or its business,
including without limitation: (i) the contents of any Business Plan, projections or financial
or credit information or data relating to the Company; (ii) the contents of any manuals or
written materials of the Company; (iii) the names and records of actual or prospective
clients, customers, suppliers, tenders, financing sources, or related persons; (iv) the terms of
various agreements between the Company and third parties; (v) any data or database, or
other information compiled or developed by the Company; (vi) any computer programs and
listings, source codes and/or object codes, file structures, trademarks, trade secrets, patents,
patent designs, patent applications, copyrights, forms, procedures, processes, training
methods, developments, technical information, marketing activities and procedures and
methods of operation, methodologies and processes for the display of video on the World
Wide Web, together with any other information, data, know-how or knowledge of a
confidential or proprietary nature; and (vii) any information of a type described above
derived or obtained from the internet or any website of the Company, including without
limitation, the file structure relating to such website or the content of such website.
Notwithstanding the foregoing, the term "Proprietary Information" does not include
information which (i) is already known to the undersigned or in the undersigned's
possession, (ii) is or becomes generally available to the public other than as a result of a
disclosure by the undersigned, or (iii) becomes available to the undersigned on a non-
confidential basis from a source other than the Company or its representatives, provided that
such source is not known, to be bound by a confidentiality agreement with, or other
obligation of secrecy to, the Company, or, (iv) is independently developed by the
undersigned without violating this Agreement. The undersigned shall bear the burden of
demonstrating the availability of any of the exceptions set forth in the preceding sentence.

  The undersigned acknowledges that the Proprietary Information constitutes valuable,
special and unique assets of the Company. The undersigned agrees (a) to receive in trust,
and treat as confidential, the Proprietary Information; (b) not to use any of the Proprietary
Information for any purpose without the prior written consent of Brian Utley, Simon L.
Bernstein or Eliot Bernstein on behalf of the Company; (c) not to disclose any of the
Proprietary Information to anyone (other than to such of the undersigned's employees or

454518.01 02

advisors who have a need to know such (information for the sole purpose of assisting the undersigned in evaluating such Information; provided that the undersigned shall be liable for any breach of confidentiality or use by such employees or advisors) without the prior written consent of Brian Utley, Simon L. Bernstein or Eliot Bernstein on behalf of the Company; (d) not to reproduce, store or copy any Proprietary Information in any form (other than as necessary to evaluate such Proprietary Information) without the prior written consent of Brian Utley, Simon L. Bernstein or Eliot Bernstein on behalf of the Company; in the event that the parties do not proceed to an agreement, all items including all duplicates and copies will be returned to the company or proof of their destruction will be provided, and (e) not to fax, distribute or reverse engineer any Proprietary Information. The undersigned understands that all Proprietary Information is confidential and that all rights, title and interest in the Proprietary Information is and shall remain the exclusive property of the Company, and no license or other rights are being granted to the undersigned by the Company.

The undersigned further agrees that the Company shall be entitled to equitable relief, including injunction, in the event of any breach of this Confidentiality Agreement, that the granting of such relief will not be opposed and that such relief shall not be the exclusive remedy for such breach. Furthermore, the undersigned agrees to defend and hold harmless the Company from any loss, cost, expense (including attorney's fees and litigation expenses), claim, liability, or damage arising from or related to a breach of this Confidentiality Agreement.

This Agreement shall expire three (3) years from the date of execution.

This Confidentiality Agreement shall be governed by California law.

The undersigned has executed this Confidentiality Agreement as of the date set forth below.

By: _____

Print Name: _Jim Noonan_

Title: _General Manager /SVP_

Company: _Warner Bros. Online_

Date: _August 14, 2001_

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit "D"

-----Original Message-----
**From:** David.Colter@warnerbros.com [mailto:David.Colter@warnerbros.com]
**Sent:** Tuesday, January 15, 2002 8:05 AM
**To:** Eliot I. Bernstein
**Subject:** Fwd: iviewit -- FOR YOU ONLY!!!!!!!!!!

FYI -- FOR YOUR EYES ONLY

In a message dated 1/14/2002 9:51:08 PM Pacific Standard Time, David.Colter@warnerbros.com (DColter0264) writes:

> Subj:iviewit
> Date:1/14/2002 9:51:08 PM Pacific Standard Time
> From:David.Colter@warnerbros.com (DColter0264)
> To:John.calkins@warnerbros.com
> CC:CHuck.dages@warnerbros.com, Alan.Bell@warnerbros.com (ABell0848)
> *Sent on:   AOL 6.0 for Windows US sub 10551*
>
>
> John,
>
> In all the review we have done with iviewit it seems to boil down to the status of the patents and their inherent value. At that point it is a risk-reward evaluation -- without awarded patents it is difficult to completely assess the value. I would suggest that we consider one other perspective...
>
> Prior to iviewit (approx Feb 2000) the video we (WB Online) delivered on the web was QCIF (160x120) or smaller and was below full frame rate. At the time of our first meeting we also identified On2 along with iviewit as two solid players who could deliver full screen full frame rate web video. All who saw it were impressed. Greg and I visited iviewit in August and reported back that they had filed patents on scaling techniques that hinged upon a visual 'trick' which allowed the human eye to accept 320x240 video scaled to 640x480 at 30 fps as close to VHS quality. We checked with Ken Rubenstein and others who provided some solid support for iviewit, and Chris Cookson asked Greg and I to continue to work with iviewit in an R&D capacity.
>
> In the fall of 2000 iviewit also met with a number of folks at WB Online (in September and October) and demonstrated their process and techniques to Sam Smith, Houston, Joe Annino and others. Sam contacted iviewit a number of times and requested the patents, along with specifics of the iviewit process to evaluate

what they were doing. I was not part of these meetings, but was aware they had occured, as Jack Scanlon kept me up to date.

When I sat down with Morgan and Houston in March 2001 to see what technology they were using to encode video, it was clear that they were using some of the techniques that would overlap with iviewit's filed process patents (still pending), but it is not clear that these were all learned from iviewit -- we may wish to explore this a little. This meeting was to determine what equipment we would get for our lab at 611 Brand. This same information was also provided to iviewit by Morgan as they were establishing the company as an outsourcing facility for encoding our content.

I am aware of several meeting held between iviewit and WB Online to share information of techniques and process, and was invited to a few of them.

We all signed iviewit's confidentiality agreement. So to the other perspective....

We have an opportunity to establish a license with iviewit for a modest fee at this time, and establish a MFN. In good faith we signed the confidentiality agreement, iviewit revealed their processes and techniques, and we now use those techniques in encoding. As we have discussed on a few occasions, these techniques now appear in the public domain to some extent in documentation for Real Producer, WMP Developer Guides, Media Cleaner Pro, etc, but they were not available in 2000. I would not suggest we learned the techniques completely from iviewit (I actually do not know the answer), but a modest licensing fee may be appropriate and honorable considering our good faith relationship in signing the confidentiality doc.

If we choose to pass at this time the risk is primarily from iviewit's main investor, Crossbow Ventures, gaining control of the IP and approaching WB later for a license -- I do not believe they will be as friendly considering their dealings with iviewit and it's employees since Feb of 2001. It is estimated that the patents will be completed in 8-12 months.

As you are all aware I have a personal relationship with Eliot Bernstein, the founder of iviewit, and as a result, I left the evaluations and decisions to Greg, and others, and only assisted iviewit to get to the correct people in WB and AOLTW. I wanted to add this perspective as we consider if there is an option to pursue with iviewit -- they are facing continued financial pressure right now. There are many other threads to our interaction with iviewit and I would be happy to discuss.

Thanx,
David

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit "E"

**Subject:** Your Response of February 20 -- Final Proposal
  **Date:** Wed, 27 Feb 2002 08:10:12 -0800
  **From:** "P. Stephen Lamont" <psl@iviewit.com>
    **To:** <john.calkins@warnerbros.com>
    **CC:** "Eliot I. Bernstein" <eliot@iviewit.com>, "Chuck N. Brunelas" <chuck@iviewit.com>,
      <david.colter@warnerbros.com>, <Mpegcto@aol.com>, <chuck.dages@warnerbros.com>,
      <sbrower@sortlaw.com>


Dear John:

Thank you, finally, for your recent reply to my inquiries.  Moreover, I would have hoped
that your read of my email message sent on February 8 at 3:37 PM EST was a little more
diligent than it appears at present, so to refresh your memory, I have stated that
Iviewit is of a different opinion pertaining to unauthorized uses of Iviewit techniques
by Warner Bros. and that differing view is evidenced by the numerous and documented
executed contracts, memos, emails, meeting notes, and parole evidence currently in the
company's possession, all of which I have had the opportunity to review at this point;
hopefully, you had the support of your Board before you knowingly filled your response
with misinformation, the nature of which can only astound one of comparable mind.
Factually, any one of a number of present and past Iviewit employees, and any one of a
number of present or former Warner Bros. employees, whether by subpoena or cross
examination at trial, would at
test, lest they perjure themselves, that since February 2000, the Iviewit/Warner Bros.
dialogues were lessons in: (i) disclosing patent pending techniques under that certain
NDA dated August 14, 2000; (ii) instructing how to make the patent pending techniques
disclosed under that NDA; (iii) instructing how to use the patent pending techniques
under that certain NDA; and (iv) that no, I repeat, no such video techniques existed on
any Warner Bros. or affiliated sites prior to the dissemination of this information, and
not orally with a wink and a nod I lastly remind you, but under NDA, an NDA executed by a
Warner Bros. executive.
Furthermore, presently I am surrounded by draft after draft of subsequently executed
documents, Warner Bros. authored memo after memo, Warner Bros. authored email after
email, meeting note after meeting note authored by both parties, and not the least
compelling of all, parole evidence that is in diametric opposition to your misinformed
response of Feb
ruary 20.  With this said, John, I ask you, and as we say in NY, "do you think I just
fell off the turnip truck?"
Now therefore, and on behalf of Iviewit, I attach what amounts to a Final Proposal.  Mind
you, Iviewit requires execution of said Final Proposal no later than Wednesday, March 6,
2002 at 5:00 PM EST, and should execution of said Final Proposal not be forthcoming
Iviewit must and shall, regretfully, seek its adequate remedy at law or in equity in
protection of its intellectual property at which time we shall allege that Warner Bros.
has, inter alia, misappropriated said intellectual property, conducted the prior
unauthorized use, conducted the present unauthorized use, and plans the future
unauthorized use, knowingly and willfully, in material breach of that certain NDA dated
August 14, 2000.
 <>


Best regards,

P. Stephen Lamont
Chief Executive Officer, Director
I View It Technologies, Inc.
10 Mela
Rancho Palos
Verdes, Cal.  90275
Tel: 914-217-0038
Email: psl@iviewit.com; pstephen.lamont@verizon.net
URL: www.iviewit.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit "F"

# IVIEWIT HOLDINGS, INC.

**P. Stephen Lamont**
**Chief Executive Officer**
**Direct Dial: 914-217-0038**

## By: Electronic Mail

August 13, 2012

Paul Cappuccio
Executive Vice President & General Counsel
Time Warner Inc.
One Time Warner Place
New York, NY 10019

Re:     Cease and Desist Demand

Dear Mr. Cappuccio:

I am writing on behalf of Iviewit Holdings, Inc., and in my capacity as Chief Executive Officer, to notify you that Time Warner's continued breach of confidentiality agreements ("NDA") by and between Iviewit entities and Warner Brothers and Warner Bros. Online executed on August 14, 2000, February 27, 2001, and August 14, 2001 is unlawful. Time Warner's continued use without authorization of video and imaging techniques learned under NDA were disclosed by Iviewit and pertain to United States Patent No's: 09/630,939, 09/522,721, 09/587,734, 09/587,026, 09/587,730, among others. Accordingly, you are hereby directed to:

## CEASE AND DESIST ALL BREACHES OF NDAs.

All video and imaging techniques are covered by the NDA and the techniques are exclusively owned by Iviewit under NDA and have been in effect since the date Iviewit made the knowledge transfers and technology disclosures.

It has come to our attention that you have been, including but not limited to, digitizing video according to such learned techniques in Warner Bros.' and other Time Warner subsidiaries' encoding of feature length films and television programs, replicating Blu-Ray and DVD discs according to Iviewit, and have rendered, decoded, and stored Iviewit

Paul Cappuccio
Page 2

encoded video on such hardware products as Time Warner Cable set top boxes from 2001 to 2008. Your actions constitute violation of United States Federal law and State laws and damages have been sustained up to $220,000,000. If you continue to engage in breaches of the NDA after receiving this letter, your actions will be evidence of "willful breach of contract."

## CEASE AND DESIST ALL FALSE ALLEGATIONS.

In addition to breach of the confidentialities of disclosures made pertaining to United States Patent No's: 09/630,939, 09/522,721, 09/587,734, 09/587,026, 09/587,730, among others, you have made allegations on your website, advertisements, and point of sale collateral that are without substance, untrue, and that we regard as damaging to our reputation as suppliers of backbone, enabling technologies for the encoding and transmission of digital video offline and online. At this time we demand that you remove such allegations from your web site, advertisements, and point of sale collateral and cease and desist from making any allegations or passing any false and unsubstantiated public comments directly or indirectly about your company, products, services, or other companies who use your technology.

We demand that you: immediately cease and desist your unlawful use of video and imaging techniques learned under NDA; contact all persons and entities to whom you have directly or indirectly provided services to or plan to provide services to and inform them that such techniques are confidential/patent pending techniques belonging to Iviewit Holdings, Inc. that were provided improperly in breaches of the NDA; provide Iviewit Holdings, Inc. with contact information for such all persons and entities; cease and desist from making any unsubstantiated allegations or passing any false or unsubstantiated public comment directly or indirectly relating to Time Warner, its products and services or companies who may use Time Warner's products and solutions;  send written retractions to all persons and entities to whom you have directly or indirectly distributed the unsubstantiated allegations relating to Time Warner's products or services; and, issue a public press release on the AP wire containing the following statement:

> "Iviewit Holdings, Inc. has requested that we remove all references to our enhancement of video on our homepage, advertisements, and point of sale collateral as it contained numerous inaccuracies and material subject to their executed confidentiality agreement and knowledge transfers and technology disclosures previously made to Time Warner and/or its subsidiaries, affiliates, and related parties. I would also like to apologize to Iviewit Holdings, Inc. for misrepresenting the capabilities of our products and for distributing confidential techniques without Iviewit's permission."

On clarifying the actions of Time Warner's video products and solutions alone, it is clear that while they "enhance" many aspects of video performance they are not in fact solely attributable to any singular savings in bandwidth, savings in storage requirements, and lower processing power, but those are the value propositions of Iviewit when combined with Time Warner's products and solutions.

---

**175 King Street, Armonk, N.Y.  10504**

Paul Cappuccio
Page 3

Time Warner's products and solutions are integrated by intent by other device manufacturers and operators; such products and solutions alone do not meet the stated enhancement of device and operator performance identified above nor does it solely enhance the operation of the device as we previously claimed.

Please provide Iviewit Holdings, Inc. with prompt written assurance by electronic mail not later than August 30, 2012 that you have complied with the foregoing.

If you do not comply with these cease and desist demands within this time period, please be advised that Iviewit Holdings, Inc. will pursue all available legal remedies, including seeking monetary damages, injunctive relief, and an order that you pay court costs and attorney's fees. In addition, Iviewit Holdings, Inc. is entitled to use your failure to comply as evidence of "willful violation" of NDAs and seek monetary damages and equitable relief for your unlawful actions. In the event you fail to meet this demand, your liability and exposure under such legal action could be considerable, and would include, but not be limited to, the claim to ALL UNPAID ROYALTIES FOR THE PAST ELEVEN YEARS plus punitive damages from the inception of the NDAs.

Before taking these steps, however, Iviewit Holdings, Inc. wishes to give you one final opportunity to discontinue your illegal conduct by signing and returning the attached Agreement by August 30, 2012 along with timely settlement negotiations for the past due unpaid royalties but only with wire of a good faith deposit of $250,000 in exchange for such negotiations.

Very truly yours,

P. Stephen
x Lamont

Digitally signed by P. Stephen Lamont
DN: cn=P. Stephen Lamont, o=Iviewit
Technologies, Inc., ou,
email=psl.iviewit@gmail.com, c=US
Date: 2012.09.07 14:52:54 -04'00'

P. Stephen Lamont
Chief Executive Officer

Cc:

Robert Normile
Secretary, Chief Legal Officer & Executive VP
Mattel Inc.
333 Continental Boulevard
El Segundo California 90245

Jorgen Vig Knudstorp
Chief Executive Officer
LEGO Danmark A/S
DK-7190 Billund
Denmark

Paul Cappuccio
Page 4


Donald J. Hall, Jr.
President and Chief Executive Officer
Hallmark
2501 McGee Trafficway
Kansas City, MO 64108

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Christina A. Snyder and the assigned discovery Magistrate Judge is Victor B. Kenton.

The case number on all documents filed with the Court should read as follows:

## CV12- 8030 CAS  (VBKx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=  =  =  =  =  =  =  =  =  =  =  =  =  =  =  =  =  =  =  =  =  =  =  =  =  =  =  =

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| ☒ **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | ☐ **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | ☐ **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |
|---|---|---|

Failure to file at the proper location will result in your documents being returned to you.

Name & Address:

P. Stephen Lamont, Pro Se
926 Boston Post Road
Rye, N.Y. 10580

*FOR OFFICE USE ONLY*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | CASE NUMBER |
|---|---|
| P. Stephen Lamont, individually, and as Nominee for 100% of the Capital Shares of Iviewit Holdings, Inc.<br>PLAINTIFF(S)<br>v.<br>Time Warner Inc. and Warner Bros. Entertainment Group<br>DEFENDANT(S). | **CV12  08030 CAS VBKx**<br><br>**SUMMONS** |

TO:     DEFENDANT(S):

A lawsuit has been filed against you.

Within ___21___ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _P. Stephen Lamont, Pro Se_____, whose address is _926 Boston Post Road, Rye, N.Y. 10580_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

*FOR OFFICE USE ONLY*

Clerk, U.S. District Court

Dated:  ___9/18/12___          By: _____
                                         Deputy Clerk

                                         *(Seal of the Court)*

1181

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☑)
P. Stephen Lamont, individually, and as Nominee for 100% of the Capital Shares of Iviewit Holdings, Inc.

**DEFENDANTS**
Time Warner Inc., Warner Brothers Entertainment Group

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

926 Boston Post Road
Rye, New York 10580
(914) 217-0038

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant
☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☑ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☑ 4 |
| Citizen of Another State | ☑ 2 | ☑ 2 | Incorporated and Principal Place of Business in Another State | ☑ 5 | ☑ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify):
☐ 6 Multi-District Litigation
☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☑ No   ☐ **MONEY DEMANDED IN COMPLAINT: $** 250,000,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. §1332; 28 U.S.C. §1391 - Breach of Confidentiality Agreements leads to unauthorized use of Technologies

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Injury | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☑ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 630 Liquor Laws | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 640 R.R. & Truck | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 650 Airline Regs | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | **REAL PROPERTY** | **IMMIGRATION** | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | | | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

CV12 08030

**FOR OFFICE USE ONLY:** Case Number:

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

CV-71 (05/08)

CIVIL COVER SHEET

Page 1 of 2

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No  ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No  ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or
☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐  Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | New York |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐  Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | Delaware |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles |  |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): P. Stephen Lamont   Date August 31, 2012

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |